Approved: _____
　　　　　ALEXANDER WILSON
　　　　　Assistant United States Attorney

Before:　HONORABLE GABRIEL W. GORENSTEIN
　　　　　　（Sarah Netburn）
　　　　　United States Magistrate Judge
　　　　　Southern District of New York

**14 MAG 1160**

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA　　　　　　:　**SEALED**
　　　　　　　　　　　　　　　　　　　　　**COMPLAINT**
　　　　- v. -　　　　　　　　　　　　　:　Violations of 18 U.S.C.
　　　　　　　　　　　　　　　　　　　　　§§ 1029(b)(2), 1028A
LUIS GUSTAVO TAVAREZ,　　　　　　　　:
ANTHONY REYNOSO,　　　　　　　　　　　　COUNTY OF OFFENSE:
PLINIO PINEDA LOPEZ,　　　　　　　　:　NEW YORK
WARNER ALVAREZ ALMANZAR,
VICENTE D. ESPINAL,　　　　　　　　　:

　　　　　　Defendants.

- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

　　　　JENNA HALL, being duly sworn, deposes and says that he is a Special Agent with the United States Secret Service ("USSS"), and charges as follows:

### COUNT ONE
(Conspiracy to Commit Access Device Fraud)

　　　　1.　From at least in or about April 2013 through at least in or about April 2014, in the Southern District of New York and elsewhere, LUIS GUSTAVO TAVAREZ, ANTHONY REYNOSO, PLINIO PINEDA LOPEZ, WARNER ALVAREZ ALMANZAR, and VICENTE D. ESPINAL, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, to violate Title 18, United States Code, Sections 1029(a)(2), 1029(a)(3), 1029(a)(4) and 1029(a)(5).

　　　　2.　It was a part and an object of the conspiracy that LUIS GUSTAVO TAVAREZ, ANTHONY REYNOSO, PLINIO PINEDA LOPEZ, WARNER ALVAREZ ALMANZAR, and VICENTE D. ESPINAL, the defendants, and others known and unknown, knowingly and with intent to defraud, in an offense affecting interstate and foreign

commerce, would and did traffic in and use one and more unauthorized access devices during a one-year period, and by such conduct obtained items of value aggregating more than $1,000 during that period, in violation of Title 18, United States Code, Section 1029(a)(2).

3. It was further a part and an object of the conspiracy that LUIS GUSTAVO TAVAREZ, ANTHONY REYNOSO, PLINIO PINEDA LOPEZ, WARNER ALVAREZ ALMANZAR, and VICENTE D. ESPINAL, the defendants, and others known and unknown, knowingly and with intent to defraud, in an offense affecting interstate and foreign commerce, would and did possess fifteen and more devices which were counterfeit and unauthorized access devices, in violation of Title 18, United States Code, Section 1029(a)(3).

4. It was further a part and an object of the conspiracy that LUIS GUSTAVO TAVAREZ, ANTHONY REYNOSO, PLINIO PINEDA LOPEZ, WARNER ALVAREZ ALMANZAR, and VICENTE D. ESPINAL, the defendants, and others known and unknown, knowingly and with intent to defraud, in an offense affecting interstate and foreign commerce, would and did produce, traffic in, control, and possess device-making equipment, in violation of Title 18, United States Code, Section 1029(a)(4).

5. It was further a part and an object of the conspiracy that LUIS GUSTAVO TAVAREZ, ANTHONY REYNOSO, PLINIO PINEDA LOPEZ, WARNER ALVAREZ ALMANZAR, and VICENTE D. ESPINAL, the defendants, and others known and unknown, knowingly and with intent to defraud, in an offense affecting interstate and foreign commerce, would and did effect transactions, with one and more access devices issued to another person or persons, to receive payment and any other thing of value during a one-year period the aggregate value of which was equal to and greater than $1,000, in violation of Title 18, United States Code, Section 1029(a)(5).

OVERT ACTS

6. In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a. On or about June 3, 2013, VICENTE D. ESPINAL, the defendant, used a counterfeit credit card encoded with a credit card number belonging to another individual to purchase merchandise at a retail store in Yonkers, New York.

2

    b. On or about June 20, 2013, LUIS GUSTAVO TAVAREZ and ANTHONY REYNOSO, the defendants, used counterfeit credit cards encoded with a credit card number belonging to another individual to purchase merchandise at a retail store in Southington, Connecticut.

    c. On or about July 27, 2013, PLINIO PINEDA LOPEZ, the defendant, used a counterfeit credit card encoded with a credit card number belonging to another individual to purchase merchandise at a retail store in Brookline, Massachusetts.

    d. On or about November 29, 2013 LUIS GUSTAVO TAVAREZ and WARNER ALVAREZ ALMANZAR, the defendants used counterfeit credit cards encoded with a credit card number belonging to a business to purchase merchandise at a retail store in Harlem, New York.

    e. On or about December 19, 2013, LUIS GUSTAVO TAVAREZ, the defendant, used a counterfeit credit card encoded with a credit card number belonging to a business to purchase merchandise at a retail store in New York, New York.

    f. On or about April 4, 2014, WARNER ALVAREZ ALMANZAR, the defendant used a counterfeit credit card encoded with a credit card number belonging to another individual to purchase merchandise at a retail store in Amherst, New York.

    (Title 18, United States Code, Section 1029(b)(2).)

### COUNT TWO
(Aggravated Identity Theft)

    7. From at least in or about April 2013, through in or about April 2014, in the Southern District of New York and elsewhere, LUIS GUSTAVO TAVAREZ, ANTHONY REYNOSO, PLINIO PINEDA LOPEZ, WARNER ALVAREZ ALMANZAR, and VICENTE D. ESPINAL, the defendants, and others known and unknown, willfully and knowingly did transfer, possess, and use, without lawful authority, a means of identification of another person, during and in relation to the felony violation charged in Count One of this Complaint, to wit, the defendants used, and aided and abetted the use of, stolen credit card information belonging to other individuals in order to make unauthorized purchases of merchandise.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b) and 2.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

8. I am a Special Agent with the United States Secret Service ("USSS") and I have been personally involved in the investigation of this matter. This affidavit is based upon my own observations, conversations with other law enforcement agents and others, and my examination of reports and records prepared by others. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## BACKGROUND TO THE INVESTIGATION

9. From at least in or about April 2013, through at least in or about April 2014, in the Southern District of New York and elsewhere, the defendants and their co-conspirators carried out an extensive counterfeit credit card fraud scheme. As part of the scheme, the defendants and their co-conspirators stole the account numbers for more than 150 credit cards and used those stolen account numbers to make at least $500,000 in unauthorized purchases of store gift cards and merchandise at national retail merchandise chains. The investigation conducted by the USSS has, to date, revealed approximately 200 occasions on which the conspirators made such purchases at locations across New York, New Jersey, Pennsylvania, Connecticut, Rhode Island and Massachusetts.

10. The scheme generally worked as follows. The conspirators obtained stolen credit card information from computer hackers who remotely compromised databases containing credit card numbers and/or from "carding" websites, which are Internet-based forums in which users sell and exchange stolen credit card numbers. The conspirators then produced counterfeit credit cards that were encoded with the stolen account information and used those counterfeit cards to make unauthorized purchases of store gift cards and retail items. The gift cards and retail items were then sold to others or returned to the stores for a cash refund.

11.   From conversations that I and other law enforcement officers have had with representatives of the parent company ("Retailer") of various retail chains ("Chain-1," "Chain-2," and "Chain-3") including Chain-1, Chain-2 and Chain-3, and my review of documents provided by Retailer, I know that Retailer surveillance photographs (the "Surveillance Photographs") captured images of individuals involved in the fraudulent scheme purchasing retail items and store gift cards using counterfeit credit cards.

12.   As set forth below, there is probable cause to believe that LUIS GUSTAVO TAVAREZ, ANTHONY REYNOSO, PLINIO PINEDA LOPEZ, WARNER ALVAREZ ALMANZAR, and VICENTE D. ESPINAL, the defendants, are participants in the fraudulent scheme whose images were captured by Retailer.

### DEFENDANT LUIS GUSTAVO TAVAREZ

13.   Based on the Surveillance Photographs, Retailer identified one particular individual who made approximately 425 purchases totaling $178,690.10 using counterfeit credit cards. I have compared photographs taken from the Surveillance Photographs which clearly show this individual's features to a photograph of defendant LUIS GUSTAVO TAVAREZ ("TAVAREZ") maintained by the New York Department of Motor Vehicles (the "Tavarez Photograph"), and determined that they show the same person. The purchases made by TAVAREZ include, but are not limited to, the following:

a.   On or about June 3, 2013, TAVAREZ purchased approximately $300 worth of store gift cards and $450 worth of retail items at a Chain-1 retail store in Bristol, Connecticut using a credit card encoded with a credit card number (the "Victim-22 CC Number") belonging to another individual ("Victim-22") who Retailer subsequently learned had not authorized its use for such purchases.[1] As set forth in paragraph 16(c) below, TAVAREZ was accompanied by defendant ANTHONY REYNOSO ("REYNOSO") who also made various purchases with counterfeit credit cards.

b.   On or about June 20, 2013, TAVAREZ purchased $2,400 worth of store gift cards and $441.22 worth of retail items at a Chain-1 retail store in Southington, Connecticut using a credit card encoded with a credit card number (the "Victim-1 CC Number") belonging to another individual ("Victim-

---

[1] Retailer does not record the name actually printed on credit cards used by customers at its retail stores.

5

1") who Retailer subsequently learned had not authorized its use for such purchases. As set forth in paragraph 16(d) below, TAVAREZ was accompanied by REYNOSO, who also made various purchases using a credit card encoded with the Victim-1 CC Number.

          c.   On or about August 3, 2013, TAVAREZ, accompanied by defendant WARNER ALVAREZ ALMANZAR ("ALVAREZ"), purchased $9,500 worth of store gift cards and $54.35 worth of retail items at a Chain-3 retail store in Hyannis, Massachusetts using a credit card encoded with a credit card number (the "Victim-2 CC Number") belonging to another individual ("Victim-2") who Retailer subsequently learned had not authorized its use for such purchases.

          d.   On or about August 7, 2013, TAVAREZ purchased $1,485 worth of store gift cards and $289.91 worth of retail items at a Chain-1 retail store in North Dartmouth, Massachusetts using a credit card encoded with a credit card number (the "Victim-3 CC Number") belonging to another individual ("Victim-3") who Retailer subsequently learned had not authorized its use for such purchases. As set forth in paragraph 17(a) below, TAVAREZ was accompanied by defendant DEIVI MARTINEZ BRITO ("MARTINEZ"), who also made various purchases with a counterfeit credit card.

          e.   On or about November 29, 2013, TAVAREZ purchased $1,800.00 worth of store gift cards at a Chain-2 retail store in Harlem, New York using a credit card encoded with a credit card number (the "Victim-4 CC Number") belonging to a business ("Victim-4") that Retailer subsequently learned had not authorized its use for such purchases. TAVAREZ was accompanied by ALVAREZ and two other co-conspirators who made various purchases totaling $6,768.47 with three other credit cards encoded with the Victim-4 CC Number.

          f.   On or about December 19, 2013, TAVAREZ purchased $3,000 worth of store gift cards at a Chain-2 retail store in New York, New York using a credit card encoded with the Victim-4 CC Number.

          14.   From conversations that I and other law enforcement officers have had with officers of the Pennsylvania State Police ("PSP"), and my review of documents provided by PSP, I know that:

          a.   On or about November 5, 2013, PSP officers

conducted a traffic stop of a car, registered to another individual, in which TAVAREZ was a passenger. After obtaining consent to search the car, PSP officers discovered a motorized trap in the floor of the car.

        b.    The trap contained 54 credit, debit, and gift cards in a variety of different names, including five cards in the name of TAVAREZ.

        c.    The trap also contained a magnetic strip reader. Based on my training and experience, I know that a magnetic strip reader is a device that is used by creators of counterfeit credit cards to encode cards with magnetic strips with credit card account information.

        d.    Following the discovery of the trap and its contents, TAVAREZ was arrested, and PSP officers seized an HP laptop computer (the "Laptop") from the car.

        e.    A photograph of TAVAREZ was taken in connection with his arrest. I have compared that photograph to the Surveillance Photographs and the Tavarez Photograph and determined that they all show the same person.

        15.    From my review of files obtained through a search of the Laptop conducted pursuant to a search warrant, I know the following:

        a.    The Laptop contained various pictures of TAVAREZ.

        b.    The Laptop contained software designed for operating a magnetic strip reader to encode cards with credit card account information.

        c.    The user of the Laptop had an account at a "carder" website where stolen credit card information is offered for sale. The user shopped for stolen credit information at the website on at least October 8, 17, 23, and 26, 2013, and made purchases of stolen credit card information on at least October 23 and 26, 2013.

### DEFENDANT ANTHONY REYNOSO

        16.    Based on the Surveillance Photographs, Retailer identified one particular individual who made approximately 71 purchases totaling $21,992.02 using counterfeit credit cards. I

have compared photographs taken from the Surveillance Photographs which clearly show this individual's features to a photograph of REYNOSO maintained by United States Citizenship and Immigration Services, and determined that they show the same person. The purchases made by REYNOSO include, but are not limited to, the following:

      a. On or about May 29, 2013, REYNOSO purchased approximately $750 worth of store gift cards and $62.71 worth of retail items at a Chain-2 retail store in Bridgeport, Connecticut using credit cards encoded with credit card numbers (the "Victim-5 CC Number," the "Victim-6 CC Number" the "Victim-7 CC Number" and the "Victim-8 CC Number") belonging to other individuals ("Victim-5," "Victim-6," "Victim-7" and "Victim-8") who Retailer subsequently learned had not authorized their use for such purchases.

      b. On or about May 31, 2013, REYNOSO accompanied TAVAREZ to a Chain-2 retail store in Cheshire, Connecticut and purchased approximately $1,500 worth of store gift cards using a credit card encoded with a credit card number (the "Victim-9 CC Number") belonging to another individual ("Victim-9") who Retailer subsequently learned had not authorized its use for such purchases.

      c. On or about June 3, 2013, REYNOSO accompanied TAVAREZ to a Chain-1 retail store in Bristol, Connecticut and purchased approximately $900 worth of store gift cards using credit cards encoded with the Victim-9 CC Number and another credit card number (the "Victim-10 CC Number") belonging to another individual ("Victim-10") who Retailer subsequently learned had not authorized its use for such purchases.

      d. On or about June 20, 2013, REYNOSO accompanied TAVAREZ to a Chain-1 retail store in Southington, Connecticut and purchased $1,201.32 worth of store gift cards using a credit card encoded with the Victim-1 CC Number.

### DEFENDANT PLINIO PINEDA LOPEZ

      17. Based on the Surveillance Photographs, Retailer identified one particular individual who made approximately 68 purchases totaling $30,808.28 using counterfeit credit cards. I have compared photographs taken from the Surveillance Photographs which clearly show this individual's features to a photograph of defendant PLINIO PINEDA LOPEZ ("PINEDA") maintained by the New York Department of Motor Vehicles, and

determined that they show the same person. The purchases made by PINEDA include, but are not limited to, the following:

      a.    On or about July 27, 2013, PINEDA purchased approximately $3,500 worth of store gift cards and $403.72 worth of retail items at a Chain-1 retail store in Somerville, Massachusetts using a credit card encoded with a credit card number (the "Victim-14 CC Number") belonging to another individual ("Victim-14") who Retailer subsequently learned had not authorized its use for such purchases.

      b.    That same day, on or about July 27, 2013, PINEDA also purchased approximately $3,800 worth of store gift cards at a Chain-1 retail store in Brookline, Massachusetts using credit cards encoded with credit card numbers that Retailer subsequently learned belonged to other persons who had not authorized their use for such purchases, including the Victim-14 CC Number.

      c.    On or about August 1, 2013, PINEDA purchased approximately $300 worth of store gift cards and $29.99 worth of retail items at a Chain-2 retail store in Revere, Massachusetts using a credit card encoded with a credit card number that Retailer subsequently learned belonged to another person who had not authorized its use for such purchases.

      d.    On or about August 23, 2013, PINEDA purchased approximately $600 worth of store gift cards at a Chain-1 retail store in Cambridge, Massachusetts using a credit card encoded with a credit card number (the "Victim-15 CC Number") belonging to another individual ("Victim-15") who Retailer subsequently learned had not authorized its use for such purchases.

### DEFENDANT WARNER ALVAREZ ALMANZAR

18.    Based on the Surveillance Photographs, Retailer identified one particular individual who made approximately 202 purchases totaling $91,221.08 using counterfeit credit cards. I have compared photographs taken from the Surveillance Photographs which clearly show this individual's features to a photograph of ALVAREZ maintained by the New York State Division of Criminal Justice Services, and determined that they show the same person. The purchases made by ALVAREZ include, but are not limited to, the following:

      a.    On or about May 17, 2013, ALVAREZ purchased

approximately $1,500 worth of store gift cards and $235.06 worth of retail items at a Chain-2 retail store in Port Chester, New York using a credit card encoded with a credit card number (the "Victim-16 CC Number") belonging to another individual ("Victim-16") who Retailer subsequently learned had not authorized its use for such purchases.

        b.    On or about August 6, 2013, ALVAREZ purchased approximately $900 worth of store gift cards and $373.02 worth of retail items at a Chain-2 retail store in Yonkers, New York using a credit card encoded with a credit card number (the "Victim-17 CC Number") belonging to another individual ("Victim-17") who Retailer subsequently learned had not authorized its use for such purchases.

        c.    On or about November 29, 2013, ALVAREZ accompanied TAVAREZ and two other co-conspirators to a Chain-2 retail store in Harlem, New York and purchased approximately $3000 worth of store gift cards using a credit card encoded with the Victim-4 CC Number.

        d.    On or about March 31, 2014, ALVAREZ purchased approximately $3900 worth of store gift cards and $770.13 worth of retail items at a Chain-2 retail store in Danbury, Connecticut using a credit card encoded with a credit card number (the "Victim-18 CC Number") belonging to another individual ("Victim-18") who Retailer subsequently learned had not authorized its use for such purchases.

        e.    On or about April 4, 2014, ALVAREZ purchased approximately $4500 worth of store gift cards and $205 worth of retail items at a Chain-1 retail store in Amherst, New York using a credit card encoded with the Victim-18 CC Number.

**DEFENDANT VICENTE D. ESPINAL**

        19.    Based on the Surveillance Photographs, Retailer identified one particular individual who made approximately 84 purchases totaling $25,661.48 using counterfeit credit cards. I have compared photographs taken from the Surveillance Photographs which clearly show this individual's features to a photograph of defendant VICENTE D. ESPINAL ("ESPINAL") maintained by the New York Department of Motor Vehicles, and determined that they show the same person. The purchases made by ESPINAL include, but are not limited to, the following:

        a.    On or about May 11, 2013, ESPINAL purchased

10

approximately $400 worth of store gift cards and $355.43 worth of retail items at a Chain-1 retail store in Yonkers, New York using a credit card encoded with a credit card number (the "Victim-19 CC Number") belonging to another individual ("Victim-19") who Retailer subsequently learned had not authorized its use for such purchases.

   b. On or about May 21, 2013, ESPINAL purchased approximately $200 worth of store gift cards and $1,346.78 worth of retail items at a Chain-1 retail store in Yonkers, New York using a credit card encoded with the Victim-19 CC Number.

   c. On or about May 29, 2013, ESPINAL purchased approximately $1,000 worth of store gift cards and $1.332.97 worth of retail items at a Chain-1 retail store in Yonkers, New York using a credit card encoded with the Victim-19 CC Number.

   d. On or about June 3, 2013, ESPINAL purchased approximately $1700 worth of store gift cards and $108.36 worth of retail items at a Chain-1 retail store in Yonkers, New York using a credit card encoded with the Victim-19 CC Number.

### The Identity Theft Victims

   20. From conversations that I and other law enforcement officers have had with representatives of Capital One Bank ("Capital One") and my review of documents provided by Capital One, I know the following:

   a. Victim-1 and Victim-18 were holders of Capital One credit cards with, respectively, the Victim-1 CC Number and Victim-18 CC Number.

   b. Victim-1 communicated to Capital One representatives that Victim-1 did not authorize anyone to use the Victim-1 CC Number in any of the transactions described above.

   c. Victim-18 communicated to Capital One representatives that Victim-18 did not authorize anyone to use the Victim-18 CC Number in any of the transactions described above.

   21. From conversations that I and other law enforcement officers have had with representatives of Bank of America ("BOA") and my review of documents provided by BOA, I know the following:

   a. Victim-2, Victim-3, Victim-6, Victim-7,

Victim-11, Victim-12, Victim-13, and Victim-15 were holders of BOA credit cards with, respectively, the Victim-2 CC Number, Victim-3 CC Number, Victim-6 CC Number, Victim-7 CC Number, Victim-11 CC Number, Victim-12 CC Number, Victim-13 CC Number, and Victim-15 CC Number.

    b. Victim-2 communicated to BOA representatives that Victim-2 did not authorize anyone to use the Victim-2 CC Number in any of the transactions described above.

    c. Victim-3 communicated to BOA representatives that Victim-3 did not authorize anyone to use the Victim-3 CC Number in any of the transactions described above.

    d. Victim-6 communicated to BOA representatives that Victim-6 did not authorize anyone to use the Victim-6 CC Number in any of the transactions described above.

    e. Victim-7 communicated to BOA representatives that Victim-7 did not authorize anyone to use the Victim-7 CC Number in any of the transactions described above.

    f. Victim-11 communicated to BOA representatives that Victim-11 did not authorize anyone to use the Victim-11 CC Number in any of the transactions described above.

    g. Victim-12 communicated to BOA representatives that Victim-12 did not authorize anyone to use the Victim-12 CC Number in any of the transactions described above.

    h. Victim-13 communicated to BOA representatives that Victim-13 did not authorize anyone to use the Victim-13 CC Number in any of the transactions described above.

    i. Victim-15 communicated to BOA representatives that Victim-15 did not authorize anyone to use the Victim-15 CC Number in any of the transactions described above.

  22. From conversations that I and other law enforcement officers have had with representatives of Barclay's Group ("Barclay's") and my review of documents provided by Barclay's, I know the following:

    a. Victim-4, Victim-9 and Victim-10 were holders of Barclay's credit cards with, respectively, the Victim-4 CC Number, Victim-9 CC Number and Victim-10 CC Number.

    b. Representatives of Victim-4 communicated to Barclay's representatives that Victim-4 did not authorize anyone to use the Victim-4 CC Number in any of the transactions described above.

    c. Victim-9 communicated to Barclay's representatives that Victim-9 did not authorize anyone to use the Victim-9 CC Number in any of the transactions described above.

    d. Victim-10 communicated to Barclay's representatives that Victim-10 did not authorize anyone to use the Victim-10 CC Number in any of the transactions described above.

  23. From conversations that I and other law enforcement officers have had with representatives of U.S. Bank and my review of documents provided by U.S. Bank, I know the following:

    a. Victim-16 and Victim-19 were holders of U.S. Bank credit or debit cards with, respectively, the Victim-16 CC Number and Victim-19 CC Number.

    b. Victim-16 communicated to U.S. Bank representatives that Victim-16 did not authorize anyone to use the Victim-16 CC Number in any of the transactions described above.

    c. Victim-19 communicated to U.S. Bank representatives that Victim-19 did not authorize anyone to use the Victim-19 CC Number in any of the transactions described above.

  24. From conversations I have had with Victim-2 and Victim-5, I know the following:

    a. Victim-2 was the holder of the Victim-2 CC Number and did not authorize anyone to use it in any of the transactions described above.

    b. Victim-5 was the holder of the Victim-5 CC Number and did not authorize anyone to use it in any of the transactions described above.

  25. WHEREFORE, I respectfully request that arrest warrants be issued for LUIS GUSTAVO TAVAREZ, ANTHONY REYNOSO,

PLINIO PINEDA LOPEZ, WARNER ALVAREZ ALMANZAR, and VICENTE D. ESPINAL, the defendants, and that they be arrested and imprisoned or bailed, as the case may be.

JENNA HALL
Special Agent
United States Secret Service

Sworn to before me this
27th day of May, 2014

HONORABLE GABRIEL W. GORENSTEIN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

SARAH NETBURN
United States Magistrate Judge
Southern District of New York

14